IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Lillie G. Quattlebaum, ) | |
| ) | Civil Action No. 6:06-0209-GRA-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Jo Anne B. Barnhart, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits on September 22, 2003, alleging that she became unable to work on July 30, 2003. The application was denied initially and on reconsideration by the Social Security Administration. On June 29, 2004, the plaintiff requested a hearing. The administrative law judge, before

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

whom the plaintiff, her attorney and a vocational expert appeared, considered the case *de novo*, and on August 8, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on November 25, 2005. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)     The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through December 31, 2008.
>
> (2)     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)     The claimant's pernicious anemia, neuropathy, diabetes, degenerative disc disease, vitamin B12 deficiency and pancytopenia are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).
>
> (4)     These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> (5)     The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.
>
> (6)     The claimant has the following residual functional capacity: sedentary work with restrictions which require no more than occasional balancing, stooping, kneeling, crouching and crawling and no climbing of ladders, ropes or scaffolds. The claimant has transferable skills as testified to by the vocational expert.
>
> (7)     The undersigned has carefully considered all the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR 404.1527),
>
> (8)     The claimant's past work as a unit clerk did not involve activities precluded by her residual functional capacity.

> (9)  The claimant's impairments do not prevent her from performing her past relevant work (20 CFR 404.1565) and other work that exists in substantial numbers in the national and local economy, both at the semi-skilled level, and the unskilled level.
>
> (10)  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

3

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her

4

conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

The plaintiff was born in 1957 (Tr. 50). She completed high school (Tr. 70), and worked as a unit medical secretary/cardiac care technician (Tr. 45, 65). She alleges disability beginning July 30, 2003, at age 46, due to pancytopenia;[2] fever; neuropathy in her hands, feet and legs; diabetes; back pain; and anemia (Tr. 64, 73).

The record reveals the plaintiff has a history of insulin-dependent diabetes, hypertension and low back pain (Tr. 110, 121, 129, 139-61). She also has lumbar disc bulges at L3-4 and L4-5, with mild to moderate stenosis (narrowing) at L4-5 (Tr. 153).

On July 29, 2003, the plaintiff sought emergency care for intermittent and "achy" low back pain. Dr. Patrick S. Hunt reported that the plaintiff denied having any other symptoms. On examination, she moved her extremities without difficulty and had a normal gait. Dr. Hunt prescribed Demerol for pain, after which the plaintiff felt "markedly better" (Tr. 129).

On August 3, 2003, the plaintiff was hospitalized after she presented to Lexington Medical Center with a high fever, left hip pain and fatigue. Blood tests showed severe pancytopenia. Upon admission, she was treated with antibiotics and underwent a bone marrow biopsy, which showed she had a myelodysplastic syndrome.[3] She received a

---

[2] Pancytopenia is a reduction in all cellular elements of blood, including red cells, white cells, and platelets. It is commonly caused by bone marrow disorders such as leukemia or aplastic anemia. *See Taber's Cyclopedic Medical Dictionary* (20th ed. 2005) ("Taber's), *available on* State!Ref Library CD-ROM (Second Qtr. 2006); *see also* http://en.wikipedia.org/wiki/pancytopenia.

[3] Myelodysplastic syndrome refers to inadequate bone marrow production of blood cells, and includes certain types of anemia and/or leukemia. *See Taber's, supra*.

5

red-cell blood transfusion to treat severe anemia. X-rays of her lumbar spine and left hip were normal. Further studies showed the plaintiff had an undetectable level of vitamin B12, so she was given B12 injections and folic acid supplements. During her hospital stay, the plaintiff's white blood cell and platelet count gradually improved to a normal range, and her fever resolved. She reported that her hands and feet felt cold all the time and that she had difficulty walking due to numbness in her legs. She was discharged on August 15, 2003, with diagnoses of megaloblastic anemia,[4] pancytopenia, neutropenic fever,[5] neuropathy, low back pain and diabetes (Tr. 162-213).

Following her hospitalization, the plaintiff underwent physical and occupational therapy and had some home nursing care from August through December of 2003 (Tr. 309-81).

On August 20, 2003, Dr. Asheesh Lal, an oncologist, indicated that the plaintiff was "currently unable to work" and would be reassessed in two months (Tr. 231).

On August 29, 2003, the plaintiff presented to Dr. Lal for a follow-up related to pernicious anemia. She reported that she was gradually feeling better, although she still had numbness in her hands and lower legs below the knees. She walked with a walker "to some extent." On examination, the plaintiff appeared thin, but otherwise healthy. She had an unsteady gait and could walk short distances with a walker. Dr. Lal continued her regimen of B12 injections and folic acid treatment, and he referred her to a neurologist to rule out any other causes of the neuropathy (Tr. 220-22).

On September 19, 2003, the plaintiff presented to Dr. Theodore T. Faber, a neurologist, who noted that the plaintiff was "doing better in terms of walking and balance and

---

[4]Megaloblastic anemia is characterized by enlarged red blood cells due to folic acid deficiency. *See Taber's, supra*.

[5]Neutropenic fever is a fever due to a decrease in white blood cells. *See Taber's, supra*.

strength and numbness in her hands and legs since starting on vitamin B12 injections." The plaintiff denied having any vertigo, difficulty with fine motor control or gait disturbance. On examination, she was fully alert and oriented, and showed appropriate attention and concentration. Her memory was unremarkable. The plaintiff had "at least 4/5 strength" to specific muscle testing in the upper and lower extremities, and no atrophy was noted, although her tone was slightly increased. Her coordination was mildly dysmetric for finger-to-nose and heel-to-shin movements. She could stand on a narrow base, and her gait was "somewhat unsteady." The plaintiff had no loss of sensation, and her reflexes were diminished but symmetrical. Dr. Faber assessed "B12 deficiency with neuropathy, probably also there is a component of diabetic peripheral neuropathy." He recommended nerve conduction studies and adjusted the plaintiff's medications (Tr. 289-90).

On September 26, 2003, Dr. Faber noted that nerve conduction studies showed "no evidence of neuropathology," including no evidence of neuropathy. He found that she had B12 deficiency affecting the central nervous system and recommended continued B12 supplementation (Tr. 288).

The plaintiff returned to Dr. Lal on October 3, 2002, and reported that she continued to have numbness, right knee and leg discomfort and intermittent low back pain. She used a walker and reported she had difficulty writing. The plaintiff told Dr. Lal that Neurontin helped her pain "to some extent." Dr. Lal noted that the plaintiff still had an unsteady gait, that she had developed microcytic anemia,[6] and that she appeared to have an iron deficiency. Dr. Lal adjusted the plaintiff's supplements (Tr. 218-19).

On October 31, 2003, the plaintiff reported that she had been "feeling well," although Neurontin was not alleviating her pain and that she still had pain and weakness in her extremities. She continued to use a walker and had trouble using her hands.

---

[6] Microcytic anemia is characterized by abnormally small red blood cells. *See Taber's, supra*.

7

Neurological examination revealed some weakness in the upper and lower extremities, somewhat more prominent on the right side. Dr. Lal indicated that the plaintiff's hemoglobin level had normalized on iron therapy and decreased her B12 dosage to one injection a month. An accompanying note from Dr. Lal indicated that the plaintiff was "unable to work as a result of [pernicious anemia and neuropathy]," and that she would be reevaluated in five to six months by a neurologist (Tr. 215-17).

On November 9, 2003, the plaintiff sought emergency treatment for epigastric pain. Pain and nausea medications provided "good relief" of her discomfort. The attending physician indicated her symptoms were consistent with acid reflux and directed her to follow a bland diet (Tr. 254-61).

On December 8, 2003, the plaintiff presented to Dr. Rajeev Vasudeva, a gastroenterologist, after an EGD scan showed mild atrophic gastritis. Dr. Vasudeva noted, "[o]verall, she feels great." The plaintiff reported complete resolution of her reflux symptoms. Dr. Vasudeva discussed precautions for avoiding reflux (Tr. 266).

On January 12, 2004, the plaintiff presented to Internal Medicine Associates and reported worsening back and leg pain. A straight leg raising test was negative, and the plaintiff had tenderness over the left sacroiliac joint. The physician assessed back pain with possible sacroiliitis and neuropathy (Tr. 284).

On January 14, 2004, the plaintiff returned to the emergency room with complaints of epigastric pain after eating pizza. A complete blood count was "completely normal." The plaintiff reported complete relief of her stomach symptoms with medication (Tr. 268, *see* Tr. 279).

On April 12, 2004, the plaintiff presented to Dr. Faber for a recheck of her pain. Dr. Faber noted that her symptoms had improved somewhat on medications. The plaintiff reported no side effects, and a neurological examination showed no change. Motor examination revealed "good strength throughout" and hyperactive but symmetric reflexes.

The plaintiff had mildly diminished sensation. Dr. Faber ordered an MRI of the plaintiff's neck to ensure that her signs were not coming from cervical stenosis (Tr. 286). The MRI subsequently showed moderate degenerative disc disease at C4-5 and C5-6 with exaggerated curvature (Tr. 292)

On April 14, 2004, State agency physician Dr. Charles Jones reviewed the plaintiff's records and assessed her physical residual functional capacity. He found the plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. Dr. Jones did not assess any other limitations (Tr. 297-304).

An MRI of the plaintiff's right knee, taken on April 26, 2004, showed she had fluid in her knee, which was consistent with a strain. An MRI of the left knee showed an increased signal in the meniscus that might have been caused by a tear or strain (Tr. 383-84).

On May 19, 2004, the plaintiff told Dr. Lal that she was "doing well." She denied any new problems. Dr. Lal noted that the plaintiff "still has some trouble walking around but is able to ambulate with a cane." Dr. Lal indicated that the plaintiff "overall is doing better." Blood tests showed her hemoglobin and white blood cell counts were within the normal ranges, although her main cell volume remained decreased at 77.1fL (normal is 80 to 98fL). Dr. Lal noted that the plaintiff continued to have "mild" microcytosis in spite of iron therapy and adjusted her iron dosage (Tr. 400-01).

On June 21, 2004, the plaintiff presented to Carolina Pain Specialists and reported "excruciating" pain in her right arm, fingers, low back, pelvis, left hip, knees, ankles, feet and toes. She also reported weakness and numbness in her legs, as well as mood swings. She indicated that nothing helped her pain and that standing, walking, sitting and bending triggered her pain (Tr. 391-92).

On July 8, 2004, Dr. Richard Murray stated that the plaintiff was "unable to sit due to back pain, can't go up steps [and] can't walk enough to do work." He also diagnosed depression and prescribed an antidepressant (Tr. 402).

The same day, Dr. Murray completed a "Functional Capacities Evaluation Form" in which he reported that the plaintiff could lift up to 20 pounds occasionally, and never climb, balance, stoop, kneel, crouch or crawl. He further reported that she was incapable of sedentary activity and that she could only engage in limited stress situations with limited personal relations. He stated that she was "totally disabled," and that she was incapable of prolonged sitting and walking, and climbing steps. He found the plaintiff could sit and stand for 20 minutes each at a time, and that she could walk 20 feet at a time. He found she could occasionally reach and handle, and constantly finger and feel. He indicated she could not use her feet repetitively but that she could use both hands repetitively. He concluded that the plaintiff was "unable" to work (Tr. 403-07).

Throughout late 2004 and early 2005, the plaintiff continued to receive treatment at Three Rivers Medical Associates for back and hip pain. She reported that she had pain and felt sleepy and that she had experienced a reaction to an epidural steroid injection. Treatment notes indicated that she used a cane. In December 2004, she reported that she was trying to go back to work but found it difficult. In March 2005, she indicated that pain medications were helpful. In April 2005, she reported that Neurontin stopped her leg pain (Tr. 408-15).

On April 4, 2005, Three Rivers physician Dr. Peggy Toliver-Dingle wrote a letter in which she stated that the plaintiff had a "severe disabling myelopathy due to severe B12 deficiency." She noted that the plaintiff was in constant pain due to neuropathy and limited mobility and that she was "totally disabled" (Tr. 382).

At the May 4, 2005, hearing, the plaintiff testified she took insulin four times per day, which controlled her diabetes (Tr. 427) but that she had not been able to take insulin

regularly at her past job because no one would cover for her (Tr. 424). She indicated that she walked with a cane at all times (Tr. 429-30) and that she had dizziness and drowsiness from medications (Tr. 430). She said her back got stiff when she sat and that her husband helped her get in and out of the bathtub (Tr. 431).

Vocational expert Joel D. Leonard testified that the plaintiff's past work as a unit medical secretary/heart monitor was a composite of two different jobs – unit clerk (light and semiskilled[7] as generally performed, and sedentary as she performed it), and cardiac monitor technician (sedentary and skilled,[8] both as generally performed and as she performed it) (Tr. 437). The ALJ asked Mr. Leonard a series of hypothetical questions (Tr. 438-40). Mr. Leonard testified that an individual of the plaintiff's profile, who could do sedentary exertional work with no more than occasional balancing, stooping, kneeling, crouching, and crawling, and no climbing ladders, ropes or scaffolds, could perform her past sedentary work and could also perform other jobs, such as the sedentary semiskilled jobs of information desk attendant/information clerk (66,000 jobs nationwide, 600 jobs statewide) and data entry clerk (582,054 jobs nationwide, 4,000 jobs statewide) (Tr. 439-40). The ALJ further asked Mr. Leonard to identify jobs that could be performed if the individual was limited to simple routine work due to pain and medication side effects (Tr. 440). Mr. Leonard identified the unskilled[9] sedentary jobs of bench assembler/product assembler (219,000 jobs nationwide, 1,600 jobs statewide) and product packer/grader/sorter (104,000 jobs nationwide, 900 jobs statewide) (Tr. 440).

---

[7] "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties." 20 C.F.R. § 404.1568(b).

[8] "Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced." 20 C.F.R. § 404.1568(c).

[9] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a).

11

In questionnaires submitted with her application for benefits, the plaintiff indicated that her job as a unit medical secretary was primarily performed in a seated position and that she lifted 10 pounds at most (Tr. 65).

In December 2003, the plaintiff's previous manager, Edna Quick, RN, wrote a note in which she indicated that she had observed the plaintiff and that she believed the plaintiff would have problems returning to her past work with "such severe limitation of her upper and lower extremities" (Tr. 233).

## **ANALYSIS**

The ALJ found that the plaintiff had the severe impairments of pernicious anemia, neuropathy, diabetes, degenerative disc disease, vitamin B12 deficiency, and pancytopenia. However, he further found that she retained the residual functional capacity to perform a reduced range of sedentary work and could perform her past work as a unit medical secretary or, in the alternative, other jobs existing in significant numbers in the national economy (Tr. 25). The plaintiff alleges that the decision is not based upon substantial evidence and that the ALJ erred by (1) failing to properly evaluate the opinion of treating physician Dr. Toliver-Dingle; (2) failing to find that the plaintiff's depression was a severe impairment; and (3) failing to properly consider the plaintiff's subjective complaints.

### *Treating Physician*

The plaintiff first argues that the ALJ failed to give proper weight to the opinion of treating physician Dr. Toliver-Dingle, an internist. Dr. Toliver-Dingle's treatment notes span the period of July 22, 2004, to April 4, 2005, one month before the administrative hearing (Tr. 408-415). On April 4, 2005, Dr. Toliver-Dingle stated that the plaintiff had a "severe disabling myelopathy due to severe B12 deficiency." She noted that the plaintiff was in constant pain due to neuropathy and limited mobility and that she was "totally disabled" (Tr. 382).

12

Dr. Lal, an oncologist who treated the plaintiff for pernicious anemia from August 2003 to May 2004, stated in August 2003 that the plaintiff was unable to work at that time due to her impairments (Tr. 215).  In October 2003, he noted that the plaintiff still required a walker to get around and had trouble using her hands because of the neuropathy (Tr. 216-19).  In May 2004, Dr. Lal noted that the plaintiff was doing better overall and that she still had trouble walking but was able to ambulate with a cane.  He further stated that the plaintiff still had problems with neuropathy and pain (Tr. 400-401).

Another treating physician, Dr. Richard Murray of Internal Medicine Associates, submitted treatment notes for January and April 2004 detailing his treatment of the plaintiff for back, leg, and knee pain (Tr. 283-85).  On July 8, 2004, Dr. Murray stated that the plaintiff was "unable to sit due to back pain, can't go up steps [and] can't walk enough to do work." He also diagnosed depression and prescribed an antidepressant (Tr. 402).  The same day, Dr. Murray completed a "Functional Capacities Evaluation Form" in which he reported that the plaintiff was incapable of sedentary activity and that she could only engage in limited stress situations with limited personal relations.  He stated that she was "totally disabled," and that she was incapable of prolonged sitting and walking, and climbing steps (Tr. 403-07).

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions.  These are administrative findings reserved for the Commissioner's determination.  SSR 96-2p.  Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

In his decision, the ALJ stated as follows:

> I have considered the opinions of Dr. Toliver-Dingle and Dr. Richard Murray that the claimant is totally disabled and unable to perform any jobs; however, their opinions are not based on documentary laboratory, clinical or objective medical findings (as discussed in the paragraph above) and are contradicted by the claimant's treating physician's opinions. Dr. Fishman and Dr. Lal have examined the claimant on numerous occasions and their examinations have all been essentially within normal limits except for some unsteadiness in her gait. Therefore, I cannot give the opinions of Dr. Toliver-Dingle and Dr. Murray substantial weight as their opinions are rebutted by persuasive contradictory evidence.

(Tr. 23).

In the decision, the ALJ stated that Dr. Toliver-Dingle's opinion was contradicted by notes of a physical examination during the plaintiff's Emergency Room visit on January 14, 2004, for epigastric pain (Tr. 21, 268-69). At that time, the examining physician noted that the claimant moved her extremities without difficulty, her grip strength was 5+/5+, and her gait was within normal limits (Tr. 268-69). However, as argued by the plaintiff, this single emergency room visit does not constitute substantial evidence. Further, it appears that Dr. Fishman, whose notes were also cited as contradictory evidence, treated the plaintiff's diabetes prior to her alleged date of onset of disability (Tr. 137-60). As set forth above, Dr. Lal's findings lend support to the findings of Dr. Toliver-Dingle. Based upon the foregoing, this court finds that the ALJ's finding that the opinion of Dr. Toliver-Dingle was contradicted "by the claimant's treating physicians' opinions" was in error (Tr. 23). Furthermore, upon remand, the ALJ should be instructed to specifically address the weight given to the opinion of Dr. Toliver-Dingle, to provide an explanation of the specific evidence contradicting the opinion, and to consider the evidence supporting the opinion.

*Pain*

The plaintiff next argues that the ALJ erred in failing to properly evaluate her pain and other subjective complaints.

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

15

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence.  20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility."  *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."  SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)   the individual's daily activities;

(2)   the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)   factors that precipitate and aggravate the symptoms;

(4)   the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)   treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)   any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)   any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found that the medical evidence did establish the existence of medically determinable impairments capable of producing some fo the symptoms alleged by the plaintiff (Tr. 21); however, the ALJ further found that the plaintiff's "allegations regarding her limitations are not totally credible" (Tr. 25). Within the body of the decision, the ALJ cited two emergency room visits, one in September 2002 (prior to the alleged onset date) and the other in January 2004 for epigastric pain, and an examination in July 2003 in which the plaintiff denied lower extremity numbness or weakness and complained of only an achy type pain (Tr. 22, 129).

The ALJ's finding as to the plaintiff's credibility is not supported by substantial evidence. As argued by the plaintiff, her subjective complaints and the extent to which they affect her ability to work are supported by her treating physicians' extensive treatment notes and opinions discussed above. Upon remand, the ALJ should be instructed to evaluate the plaintiff's pain in accordance with the above-cited law.

*Depression*

Lastly, the plaintiff argues that her depression was a severe impairment and further argues that the depression combined with her pain and medication side effects limited her RFC to the extent that she would be unable to perform substantial gainful activity. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* In this case, the ALJ found that the plaintiff's depression was not severe because "she has not received ongoing psychiatric treatment for this alleged impairment other than the medication which was prescribed because she complained of

17

depression due to her medical condition" (Tr. 19).  It appears that substantial evidence supports the ALJ's finding that the plaintiff's depression was not severe.  However, upon remand, the ALJ should be instructed to consider the limitations and restrictions imposed by all of the plaintiff's impairments, including those that are not severe, in assessing the plaintiff's residual functional capacity.  *See* SSR 96-8p, 1996 WL 374184, *5.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

January 8, 2007

Greenville, South Carolina

18